UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

MICHAEL E. DONATI, *Prisoner Identification No. 407-613*,

    Plaintiff,

v.

CAPTAIN DRUMMOND,
LT. JOSEPH,
LT. MITCHELL,
M. MUIR, *Case Management Manager,*
K. ENDLICH, *Case Manager Specialist,* and
SCOTT S. OAKLEY, *Executive Director,*

    Defendants.

Civil Action No. TDC-16-3293

## MEMORANDUM OPINION

On February 14, 2016, self-represented Plaintiff Michael E. Donati, then an inmate at Eastern Correctional Institution ("ECI") in Westover, Maryland, was attacked by his cellmate. On March 24, 2016, Donati, having been transferred to another part of the prison, was again attacked, this time by his new cellmate. He now brings this civil action against Defendants Captain Shytina Drummond; Lieutenant Wendy Joseph; Lieutenant Matthew Mitchell; Correctional Case Management Manager Mike Muir; Correctional Officer Karl Endlich; and Scott S. Oakley, the Executive Director of the Inmate Grievance Office, pursuant to 42 U.S.C. § 1983, alleging that Defendants failed adequately to protect him from a known threat to his health and safety, in violation of the Eighth Amendment to the United States Constitution. Pending before the Court is Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, and a Motion to Appoint Counsel filed by Donati. Having reviewed the parties'

submissions, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motion is GRANTED IN PART and DENIED IN PART, and Donati's Motion to Appoint Counsel is GRANTED.

## BACKGROUND

On or before February 10, 2016, Defendant Captain ("Capt.") Shytina Drummond received an anonymous letter stating that someone was planning to attack an inmate named "Montana" because he had "disrespected" a member of the Black Guerrilla Family ("BGF"), a prison gang, by "jacking off" while his cellmate was asleep. Mot. Dismiss Ex. 2 ¶ 3 (Drummond Decl.), ECF No. 17-4. Donati's nickname is Montana. At that time, Donati was housed in Unit 2, located on the West Compound of ECI. Donati's cellmate was Lyndon Pettiford, who, according to Capt. Drummond, was a suspected member of the BGF, and, according to Donati, was a confirmed member of the gang. On February 10, 2016, Capt. Drummond summoned Donati to her office to inform him about the letter and to conduct a cell-change interview. Although Capt. Drummond told Donati about the contents of the letter, she would not let him see it, because it contained information unrelated to Donati, and she was concerned that its contents would reveal the identity of the anonymous informant.

Capt. Drummond asked Donati about the allegations in the letter, which Donati denied. Donati then explained that he had told Pettiford to move out because Pettiford had been selling drugs out of their shared cell. According to Capt. Drummond, Donati stated that he was not in fear of his life. However, according to Donati, who had not seen the letter, he told Capt. Drummond that if she had information about a threat against him, she should move him to another cell, but she declined to do so. At the end of the interview, Capt. Drummond instructed Donati to complete a "Statement of Inmate" form and to sign a "Cell Change Interview Record."

On the Statement of Inmate form, the words "I was told that I may be harmed if I stay in" are crossed out and followed by the statement, "I feel safe to stay in housing unit #2. Capt. Drummond informed me about a threat made against me." Mot. Dismiss Ex. 1 at 5 (Statement of Inmate), ECF No. 17-3. According to Donati, Capt. Drummond forced him to cross out his first statement on the form, then told him to write what she dictated. Donati has asserted that Capt. Drummond warned him that if he did not, there "would be consequences" and he would "learn not to mess with the BGF." Resp. Mot. Dismiss ("Resp.") Ex. 1 ¶¶ 3-4, 7 (Donati Aff.), ECF No. 20-1. Capt. Drummond and Correctional Officer Ronald Mills, who was present during the cell-change interview, have both denied those allegations.

On the Cell Change Interview Record, Capt. Drummond checked "no" for Donati's responses to the questions, "Have you been threatened?," "Are you in fear for your life?," and "Have you been assaulted?" In the "Action Taken" section of the form, which contains three options, Capt. Drummond selected the option, "Inmate ... was returned to his cell. His reason did not merit a cell change, or there was no documented threat to him." Mot. Dismiss Ex. 1 at 6 (Cell Change Interview Record). Both Capt. Drummond and Donati signed the document. Capt. Drummond then forwarded a copy of the anonymous letter, the Statement of Inmate, the Cell Change Interview Record, and her notes to several other prison officials, including Defendant Lieutenant ("Lt.") Wendy Joseph, who was the manager of Unit 2.

After returning to his cell, Donati wrote a letter to Lt. Joseph asking to be transferred to another tier within Unit 2. Lt. Joseph had been on vacation starting on February 6, 2016 and continuing to February 21, 2016, so she never responded to Donati's letter. According to Donati, he had also previously written to Lt. Joseph to complain about Pettiford's drug dealing and gang

3

involvement and to ask to be moved. Lt. Joseph did not act on those letters because, in her estimation, Donati had not provided her with enough information to justify a cell reassignment.

On the morning of February 14, 2016, Pettiford attacked Donati from behind by striking him in the head with a fan motor, causing profuse bleeding and multiple head wounds, some of which required stitches. According to Donati, Pettiford was later convicted of second-degree assault as a result of the attack. Once Donati was discharged from the prison medical facility, he was temporarily placed in administrative segregation pending a meeting of the Administrative Segregation team. That team, which included Defendant Correctional Officer ("C.O.") Karl Endlich, met on February 17, 2016 and determined that Donati should be moved to the ECI East Compound, and that Donati and Pettiford should be listed as "Keep Aparts." In accordance with prison policy, that recommendation was forwarded to Defendant Correctional Case Management Manager ("Case Manager") Mike Muir, who approved it and forwarded it to the Warden for final determination. Case Manager Muir made no decision on Donati's specific cell placement in the East Compound.

On February 23, 2016, Donati was reassigned to an East Compound cell in Unit 7, where, he contends, a large number of BGF members were housed. Defendants do not deny that Unit 7 had BGF members, but they assert that Donati agreed that a placement in the East Compound was suitable and that Donati was placed on the C-tier of Unit 7, which housed no validated BGF members. In response, Donati notes that residents of different tiers, including of the neighboring D-tier where many BGF members were housed, routinely came into contact at meals, church, and the gym. Donati was placed in a cell with Jason Hall, whom Donati contends was an "unflagged" BGF member. Compl. Ex. 2 at 18 (2d ARP), ECF No. 1-3. According to Donati, Defendant Lt. Matthew Mitchell, the manager of Unit 7, made his specific cell assignment. Lt.

Mitchell denies that he decided on Donati's specific cell placement or had any knowledge of the February 10, 2016 threat before learning of Donati's lawsuit. According to Donati, however, after he was placed in a cell with Hall, he wrote Lt. Mitchell at least a dozen letters asking to be reassigned because Hall was a BGF member and had threatened him, but no action was taken. Lt. Mitchell denies receiving any such complaints.

On March 24, 2016, Hall confronted Donati, asking whether Donati had given a statement about the February 14, 2016 attack to prison officials. When Donati refused to answer, Hall stabbed him with a shank, leaving him with wounds to his head, back, arms, and hand. Donati required stiches to close wounds over his eye, behind his ear, and on his hand, and he needed 14 staples to close a wound on his head and another 14 staples for a wound on his arm. After the attack, Donati was housed first in the prison medical unit, then in administrative segregation, before he was transferred to another prison in July 2016. Donati asserts that Hall was later found guilty in state court of a weapons-possession offense.

In September 2016, a federal grand jury indicted 80 individuals in relation to a smuggling ring inside ECI, including 18 correctional officers and 35 inmates. As relevant here, the indictment alleged that correctional officers would order retaliation against inmates who spoke up about the smuggling ring or about the distribution of contraband in the prison. Donati asserts that for years prior to the attacks on him, he had written to newspapers and the FBI about drug distribution and corruption at ECI.

After filing internal grievances about both attacks through the Administrative Remedy Procedure ("ARP") and exhausting all appeals of the denials of his grievances up to and including to the Inmate Grievance Office ("IGO"), Donati filed suit in this Court asserting that with respect to both the February and March 2016 attacks, Defendants failed to protect him from

a known threat to his health and safety, in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Donati seeks declaratory and monetary relief. All Defendants have been served with the Complaint with the exception of Defendant Scott Oakley, the Executive Director of the IGO.

## DISCUSSION

The Defendants who have received service ("Defendants") have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. In that Motion, they present three bases for dismissal or summary judgment: (1) there is no supervisory liability for § 1983 claims; (2) they are entitled to qualified immunity; and (3) the evidence demonstrates that they did not fail to protect Donati from a known threat to his health and safety in violation of the Eighth Amendment.

### I. Defendant Oakley

Donati has sued, but not yet served, Defendant Oakley, whom he identifies as the Executive Director of the IGO. Because Donati is a prisoner seeking redress from a government entity or officer, the Court must dismiss any part of the Complaint that, as relevant here, fails to state a claim upon which relief may be granted. 28 U.S.C. § 1915A(b)(1) (2012). Here, Donati has failed to plead, and the evidence does not contain, any facts about Director Oakley's involvement in any of the incidents at issue. Donati therefore necessarily fails to plead factual content that would allow the Court to draw the reasonable inference that Director Oakley is liable for any of the misconduct that Donati alleges. Nor can Director Oakley be held liable based on his supervisory role at the IGO. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) ("[T]here is no *respondeat superior* liability under § 1983"). Instead, to state a § 1983 claim against a supervisor based on vicarious liability, a plaintiff must allege that (1) the

supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994). Donati makes no such allegations here, so his claim against Director Oakley is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

## II. Motion to Dismiss or, in the Alternative, Motion for Summary Judgment

### A. Legal Standard

In order to consider the exhibits submitted by Defendants in support of their Motion, the Court must construe the Motion as one seeking summary judgment. Fed. R. Civ. P. 12(d). Donati raises no objection to the Court considering those materials and indeed submits his own documentary evidence and affidavit to the Court. Under these circumstances, where there is no dispute between the parties whether the Court should consider the materials attached to the Motion, the Court deems it is appropriate to convert the Motion to one for summary judgment.

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football*

*Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

### B.  Supervisor Liability

Defendants seek dismissal on the grounds that there is no vicarious liability for § 1983 claims. This argument is misplaced. Donati's theory of liability as to Defendants does not stem from their supervisory roles at the prison. Instead, he asserts that each Defendant played a direct role in ignoring known threats to his safety, either by failing to move him out of his Unit 2 cell despite the threatening letter and his prior expressed concerns about his cellmate, by playing a part in the decision to move him to Unit 7 despite its high number of BGF members, or by placing him in a cell with a BGF member. There is thus no cause to dismiss Donati's claims on the basis that § 1983 does not allow for vicarious liability.

### C.  Qualified Immunity

Defendants also assert that they have qualified immunity to Donati's claim. Government officials sued in their individual capacities, as these Defendants are here, may invoke the protection of qualified immunity to bar a claim for civil damages under 42 U.S.C. § 1983. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity shields government officials from liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* Here, Donati claims that Defendants each participated, to differing degrees, in events that put him at substantial risk

for—and actually led to—serious harm at the hands of other inmates, in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. *See* U.S. Const. amend. VIII. The right of prison inmates to be protected from a substantial risk of serious harm perpetrated by other inmates is a long-standing one of which Defendants should have been aware. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Defendants are therefore not entitled to qualified immunity based on the nature of the right at issue. Qualified immunity would be available only if Defendants' conduct did not constitute a violation of that Eighth Amendment right, an issue discussed below.

### D. Failure to Protect

As noted, the right to be free from cruel and unusual punishment includes the right to be protected from a substantial risk of serious harm perpetrated by other inmates. *See id.*; *Makdessi v. Fields*, 789 F.3d 126, 132 (4th Cir. 2015). Accordingly, the "Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 832). Those duties include maintaining "reasonable measures to guarantee the safety of the inmates." *Id.* (quoting *Farmer*, 511 U.S. at 832). However, "not every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Rather, to demonstrate a violation of his Eighth Amendment rights, a plaintiff must satisfy a two-part inquiry that includes both objective and subjective components. *See Raynor*, 817 F.3d at 127.

First, to satisfy the objective inquiry, the plaintiff "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or a substantial risk of such harm. *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014); *see also Farmer*, 511

9

U.S. at 834. The objective inquiry requires the Court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). After the first attack, Donati had multiple head wounds, some of which required stitches. After the second attack, Donati again had multiple wounds, some of which required stitches and others of which required numerous staples in order to repair. As Defendants do not contest, such injuries are sufficient to satisfy the objective inquiry. *See, e.g., Odom v. S.C. Dep't of Corrs.*, 349 F.3d 765, 769-70 (4th Cir. 2003) (finding that evidence of an assault of the plaintiff by other inmates resulting in broken ribs satisfied the objective inquiry at the summary judgment stage).

To satisfy the subjective component of the test, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834. Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety, in that the prison officials both were aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and that they actually drew that inference. *Id.* at 837. A plaintiff may "prove an official's actual knowledge of a substantial risk in the usual ways, including inference from circumstantial evidence" so that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Raynor*, 817 F.3d at 128 (quoting *Farmer*, 511 U.S. at 842). Actual knowledge of a substantial risk does not alone impose liability. Where prison officials responded reasonably to a risk, they may be found free of liability. *Farmer*, 511 U.S. at 844.

This subjective standard is satisfied here as to the first attack. Viewed in the light most favorable to Donati, the evidence establishes that, prior to the first attack, prison officials knew

or suspected that Pettiford, Donati's cellmate, was a BGF member; Donati had repeatedly complained about Pettiford's allegedly illicit activity to Lt. Joseph and asked to be moved; and prison officials received an anonymous letter warning them that someone with Donati's nickname was going to be subjected to a "hit" for "disrespecting" the BGF. Despite knowing of the threat, and despite Donati's assertion that he should be moved from his cell if his safety had been threatened, Capt. Drummond took no action. Instead, she allegedly prevented him from writing a statement expressing concern, coerced him into making a written statement that he did not fear for his safety, and did so by herself threatening him "not to mess with the BGF." Resp. Ex. 1 ¶ 7 (Donati Aff.). If credited, this chain would establish a viable Eighth Amendment failure-to-protect claim against Capt. Drummond.

Lt. Joseph's role in this sequence is more tenuous because she was on vacation at the time of the cell-change interview and the first assault, and thus appears not to have played a role in responding to the threat letter. However, Donati's assertion that earlier he had repeatedly asked Lt. Joseph for a cell transfer, out of concern that Pettiford's alleged gang involvement jeopardized his safety, can support an inference that even before that letter, Lt. Joseph was aware of a significant risk to Donati's safety if he were to remain housed near Pettiford. That inference is buttressed by evidence suggesting there was a widespread prison environment of retaliation against prisoners who reported contraband. Discovery may substantiate Lt. Joseph's assertion that Donati's complaints alone did not give her enough information to justify a transfer, but such a determination at this point, considering the factual dispute between the parties, would be premature.

As for the second attack, it is undisputed that C.O. Endlich, aware of the events underlying the first attack, made the recommendation to move Donati to Unit 7, C-Tier, on the

East Compound of ECI, and that Case Manager Muir approved that decision. There is no evidence that either of these Defendants played a role in selecting Donati's specific cell or in overseeing his housing after the transfer. Thus, any claim against these Defendants relating to the second attack would have to be based on the conclusion that the mere assignment of Donati to Unit 7, C-Tier, exhibited a deliberate indifference to a substantial risk to Donati's safety.

The evidence does not support such a conclusion. The known threat made against Donati had been based on his interactions with Pettiford in Unit 2 in the West Compound, and that threat was primarily addressed by moving Donati out of Unit 2 to the East Compound. According to C.O. Endlich, at the administrative segregation meeting, Donati agreed to be housed in the East Compound. Donati does not dispute that statement. Although Donati now asserts that assignment to Unit 7, C-Tier, was dangerous because BGF members were housed in the nearby D-Tier, and there were interactions between inmates in the different Unit 7 tiers at meals, in church, and at the gym, he has not claimed that he raised this concern at the administrative segregation meeting or that he otherwise objected in advance to placement in Unit 7. Notably, the second attack was perpetrated by Donati's cellmate in their cell, not by BGF members housed in D-Tier during common dining, religious, or exercise activities. As for the threat presented by Hall, Donati's cellmate who perpetrated the second attack, Donati himself has characterized Hall as an "unflagged" BGF member, thus acknowledging that Hall's gang membership was not known to prison officials. Compl. Ex. 2 at 18 (2d ARP). Donati does not dispute Lt. Mitchell's statement that there were no validated BGF members in Unit 7, C-Tier. Thus, there is no evidence from which to conclude that C.O. Endich or Case Manager Muir knew that placing Donati in Unit 7, C-Tier, exposed him to a substantial risk to his safety. *See Farmer*,

511 U.S. at 837. Donati's claim against C.O. Endlich and Case Manager Muir will thus be dismissed.

As for Lt. Mitchell, the evidence is sufficient for Donati's claim to proceed. Even if Lt. Mitchell had no knowledge of the prior threats made against Donati or any general risk associated with housing him in Unit 7, C-Tier, Donati has asserted that on multiple occasions after he was assigned to share a cell with Hall, he wrote to Lt. Mitchell asking to be transferred because Hall was a BGF member and had threatened him. If Lt. Mitchell knew that Hall was actually a member of BGF, the gang that had previously ordered a hit on Donati, and that Hall had directly threatened Donati, he would have then been aware of a substantial risk to Donati's safety, such that his failure to take steps to separate Donati from Hall could be deemed to constitute deliberate indifference to Donati's safety. *See Whitley v. Albers*, 475 U.S. 312, 319 (1986). Although Lt. Mitchell denies receiving such letters, because the Court views the evidence in the light most favorable to Donati, there is, at a minimum, a genuine issue of material fact that precludes summary judgment at this time. Accordingly, the Motion will be denied as to Lt. Mitchell.

### III. Motions for Appointment of Counsel

Donati has filed two Motions for Appointment of Counsel. In the motions, he asserts that he is unable to afford counsel, that his claims have legal merit, that discovery would be impossible in light of his incarceration, and that he has limited knowledge of the law.

"The court may request an attorney to represent any person" proceeding *in forma pauperis* who is "unable to afford counsel." 28 U.S.C. § 1915(e)(1). In civil actions, however, the Court appoints counsel only in exceptional circumstances. *Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975). In doing so, the Court considers "the type and complexity of the case,"

whether the plaintiff has a colorable claim, and the plaintiff's ability to prosecute the claim. *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984) (internal citations omitted), *abrogated on other grounds by Mallard v. U.S. Dist. Court for the S. Dist. of Iowa*, 490 U.S. 296 (1989).

Here, because Donati has stated a colorable claim, the case will proceed to discovery. Since Donati remains incarcerated, Donati would be unable to conduct discovery without the assistance of counsel. Accordingly, Donati's Motion will be granted.

## CONCLUSION

For the reasons set forth above, the claim against Defendant Oakley is DISMISSED, and he will be dismissed as a defendant in this action. The remaining Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, construed as a one for summary judgment, is GRANTED IN PART and DENIED IN PART. The Motion is GRANTED as to Defendants C.O. Endlich and Case Manager Muir, who will be dismissed as defendants in this action, but is DENIED in all other respects. Donati's Motion for Appointment of Counsel is GRANTED. A separate Order shall issue.

Date: September 26, 2017

THEODORE D. CHUANG
United States District Judge